**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **ROBERT GENTES,** | : | |
| **Plaintiff,** | : | |
| | : | **No. 3:20-CV-01049 (VLB)** |
| **v.** | : | |
| | : | |
| **CATHERINE OSTEN, AND** | : | **August 22, 2023** |
| **TOWN OF SPRAGUE,** | : | |
| **Defendants.** | : | |
| | : | |
| | : | |

**MEMORANDUM OF DECISION ON**
**DEFENDANTS' PARTIAL MOTIONS TO DISMISS [DKTS. 52, 54]**

During the 2018 fiscal year, the Town of Sprague's Board of Education ("BOE") overspent its $6 million-plus budget by about $835,000. Plaintiff Robert Gentes, the BOE's Business/Facilities Manager, identified two sources: (1) the non-materialization of an $800,000 grant that Defendant First Selectman Catherine Osten had insisted should be placed in the budget (which could only partially be ameliorated through subsequent budget cuts); and (2) his colleague's entry of back-dated invoices, which totaled $600,000 and which were not factored into the budget. When Gentes informed his employer of the second issue on June 7, 2018, he also tendered his resignation, effective July 7, 2018. Defendants Osten and the Town of Sprague ("Town") blamed Gentes for mismanaging the Town's finances, including during public meetings and in Defendant Osten's November 2019 campaign flyers. In May 2019, the Town also filed a breach of contract and fiduciary duty lawsuit against Gentes in state superior court, which survived summary judgment and remains pending.

Gentes filed this action in July 2020 against the Town and Defendant Osten in her individual capacity.  He alleges Defendant Osten violated his constitutional rights by selectively enforcing the law against him, retaliating against him for exercising his First Amendment free speech rights, denying his liberty interest in his reputation, and subjecting him to a pattern of harassment, all in violation of the Fourteenth Amendment as enforced by 42 U.S.C. § 1983 (Counts One through Four); the Town is vicariously liable to him for Defendant Osten's actions as the Town's highest ranking official (Count Five); and Defendant Osten defamed him, invaded his privacy by casting him a false light, and intentionally inflicted emotional distress upon him (Counts Six through Eight).  Defendant Osten moves to dismiss all constitutional rights violation claims against her—leaving the common law torts claims—and the Town moves to dismiss the sole claim against it.  Gentes opposes both motions.  For the following reasons, the Court dismisses Counts One and Three with prejudice and dismisses Counts Two, Four and Five without prejudice to repleading.

## I.   Facts

The Town is a Connecticut municipality and subdivision.  (Dkt. 1 (Compl.) ¶ 4.) The BOE is an agent of the Town, which was created to provide oversight over the Town's School District ("District").  (*Id.* ¶ 7.)   The BOE employs the superintendent who is responsible for operating the Town's public schools.  (*Id.* ¶¶ 8, 42.)

Defendant Catherine Osten is a Town resident.  (*Id.* ¶ 3.)  She served as the Town's First Selectman from 2007 through 2019.  (*Id.* ¶¶ 3, 123.) As First Selectman, she functioned as the Town's chief executive officer.  Conn. Gen. Stat. § 7-12a.

She has also served as a State Senator for District 19 since 2014.  (Dkt. 1 ¶¶ 3, 123.)  At all relevant times, Defendant Osten served as the Chair of the Senate Appropriations Committee.  (*Id.* ¶¶ 3, 37.)

Plaintiff Robert Gentes is a Connecticut resident certified by the Connecticut Department of Education as a School Business Administrator.  (*Id.* ¶ 2.)  He worked for the BOE from December 2016 until July 2018.  (*Id.* ¶¶ 6, 11.)  The BOE hired him as Interim Business Manager on December 1, 2016.  (*Id.* ¶ 6.)  When he accepted the position, he was the fourth person to serve in that role over the previous six months.  (*Id.* ¶ 9.)  Three months after he started working for the BOE, Gentes entered into an employment agreement with the BOE for the position of Business/Facilities Manager.  (*Id.* ¶ 10.)  He assumed this role on July 1, 2017.  (*Id.*)  Gentes served the BOE in this capacity until July 7, 2018, when his resignation was accepted and he became the Director of Finance for Thompson Public Schools.  (*Id.* ¶ 11.)  During his employment, Gentes reported to Superintendent Christopher Eichner from December 2016 through January 2018.  From January 2018 through the end of his employment, he reported to the subsequent Superintendent, David Erwin.  (*Id.* ¶ 12.)

As Business/Facilities Manager, Gentes had the authority to supervise the District's business operations "as directed by the Superintendent and the BOE."  (*Id.* ¶ 13.)  He did not have authority to do the following: (1) spend money on behalf

3

of the BOE; (2) issue or sign purchase orders; (3) create, monitor, or enter purchase orders or invoices into the accounting system; (4) review purchase orders or invoices before entry into the accounting system; (5) approve expenditures that did not already have BOE approval; and (6) sign checks.   (*Id.* ¶¶ 14–18.)  At all relevant times, Gentes allowed funds to be expended only if they were authorized by the Superintendent who had authority to approve purchase requisitions and purchase orders.  (*Id.* ¶  14.)

For the decade before Gentes' employment, the Town and the District had been experiencing economic and fiscal decline.  (*Id.* ¶ 20.)  Defendant Osten served as the First Selectman during this time.  (*Id.* ¶¶ 3, 21.)

A.   *Fiscal Year 2017*

The fiscal year runs from July 1 through June 30.  (*See id.* ¶ 29.)  When Gentes first started his employment in December 2016, fiscal year 2017 was halfway over.  (*Id.* ¶ 33.)  At the start of his employment, the Town had spent its $4.4 million fund balance down to zero, acquired a $5.2 million bond debt, and accumulated debt equivalent to 96.6% of its revenue.  (*Id.* ¶¶ 25-27.)  The BOE's books and records were in disarray and the accounting system was inadequate. (*Id.* ¶ 30.)  Gentes discovered that more than $91,000 of grants were used for improper expenditures that needed to be repaid to the State.  (*Id.* ¶ 31.)  He also discovered the 2016 fiscal year report had not been completed, even though it should have been by that point.  (*Id.* ¶ 33.)

### B.   *Fiscal Year 2018*

Gentes began working on the 2018 fiscal year budget in January 2017.  (*Id.* ¶ 34.)  Superintendent Eichner instructed Gentes not to include anticipated grants from the State, which meant the estimated 2018 fiscal year budget showed the Town residents would have to cover a 25% increase in expenses in comparison to the previous year.  (*Id.* ¶ 35.)  The BOE directed Gentes to remove all expenditures related to the anticipated grants, which reduced the year-over-year budget increase to 13%.  (*Id.* ¶ 36.)

During a February 2017 public meeting about the BOE budget and a Board of Finance ("BOF") meeting on March 30, 2017, Defendant Osten advised that the BOE should include in the budget a State-funded Special Education grant for $800,000.  (*Id.* ¶ 37.)  She gave this advice even though the State Senate had not officially adopted this funding.  (*Id.*)  Including the $800,000 grant in the budget would allow the BOE to use the equivalent sum of money for other needed purposes.  (*Id.* ¶ 38.)  In April 2017, then-BOE Chair Michael Smith informed the BOF and Defendant Osten that the BOE would include the $800,000 grant but, if that grant never materialized, the BOE would seek that sum from the Town to fill the gap.  (*Id.* ¶ 39.)  On June 5, 2017, the Town residents voted to pass the budget. (*Id.* ¶ 40.)

On June 14, 2017, Gentes e-mailed Superintendent Eichner, BOE Chair Smith and BOE members that the $800,000 grant—while included in the Town's budget— was not included in the General Assembly's budget proposal.  (*Id.* ¶ 42.)  He urged that the BOE budget was not finalized because failure to receive the $800,000 grant

would require up to $720,000 in 2018 fiscal year budget cuts.  (*Id.* ¶¶ 42–44.)  He advised that the Town should adhere to the previous year's spending until the Town knew whether it would receive the grant later that summer.  (*Id.* ¶ 44.)

On October 31, 2017, Governor Dannel Malloy signed the General Assembly's budget, which did not include the $800,000 grant.  (*Id.* ¶ 45.)   In December 2017, Gentes notified the BOF that the BOE would have an $800,000 shortfall.  (*Id.* ¶ 46.)  The BOF directed the BOE to cut spending by that amount, which, five months into the year, represented 13% of the budget.  (*Id.* ¶ 47.)  Then-BOE Chair Smith e-mailed the BOF Chair Ann Marie Osowski, CC'ing the BOE, the BOF, the Town Board of Selectmen, and the District administration, that "the Board relied heavily on [Defendant Osten's] input and what we could expect from the final State budget."  (*Id.* ¶¶ 48–51.)  He added, "There was no reason not to, as she was a State Senator and very much involved in the State budget process."  (*Id.* ¶ 51.)  Then-BOE Chair Smith estimated that the total shortfall would be closer to $1 million due to other cuts in the final budget.  (*Id.* ¶ 53.)

From January through April 2018, the BOE cut its budget significantly. Despite these budget cuts, Gentes still forecasted a net deficit of $208,020.  (*See id.* ¶¶ 55–59.)

On April 19, 2018, the BOF held a meeting, which Defendant Osten attended. Gentes "was the only representative of the BOE to attend and report information," and he shared how Defendant Osten's failure to secure the $800,000 grant impacted the BOE. (*Id.* ¶ 60.)  After making his report, he "joined the assembled citizens of the Town of Sprague in the audience as an ordinary citizen."  (*Id.* ¶ 61.)

6

During the meeting, Defendant Osten stated that, under § 7-349 of the Connecticut General Statutes, BOE members could be held personally liable for overspending. (*Id.*)  While in the audience, Gentes "challenged the truth of [her] statements," positing that she incorrectly cited the state statute.  (*Id.*)  As an audience member, Gentes "also challenged [her] statements regarding allocation of grant funding." (*Id.* ¶ 62.)  He claimed she was "stating untruths and knew she was being untruthful with the BOF regarding proper allocation of grant funding."  (*Id.*)

The District's Finance Operating Manual required the following procedure: purchase requisition must be entered; the Business Office must confirm availability in the budget and, upon approval, must convert the requisition to a purchase order; and the invoice must be paid promptly with available funds after the service is performed or the good received.  (*Id.* ¶ 64.)  The BOE's practice was that the Superintendent performed the Business Office function, and, once an invoice was submitted by Diane LaRowe—whose job duties included bookkeeping and accounts payable—two BOE members and the Town's Treasurer signed the check.  (*Id.* ¶ 65.)

In May 2018, LaRowe entered over $600,000 of invoices in the computerized accounting system.  (*Id.* ¶ 63.)  The majority of these costs were unforeseen and related to state and federal requirements for ten students' special education placement and transportation.  (*Id.*)  LaRowe back-dated certain expenses using old and closed purchase orders or purchase orders used for lesser amounts. (*Id.* ¶ 71.)  Doing so gave the appearance the purchase orders had been budgeted, authorized and encumbered even though this was not the case.  (*Id.*)  These

invoices caused the projected $208,020 deficit to skyrocket past $800,000.  (*Id.* ¶ 74.)

Gentes was not given authority to monitor actual spending (versus budgeted spending).  (*Id.* ¶ 67.)  He requested permission to submit or sign purchase orders, but this request was denied.  (*Id.* ¶ 68.)  Gentes therefore was not alerted to LaRowe's invoices.  (*Id.* ¶ 73.)

On June 7, 2018, Gentes sent a text message to Superintendent Erwin, stating he found the source of an unexpected increase in BOE deficit and described it as a "personnel issue."  Gentes explained, "I rarely check the outstanding requisitions individually because they are reported under encumbrances.  I do not enter them into the system because it's a bookkeeping function.  I want to be 100% sure before putting it in writing to you."  (*Id.* ¶ 75.)

That same day, Gentes gave 30-days' notice of his resignation.  (*Id.* ¶ 83.) According to the Complaint, Gentes' decision to leave was in part because he felt Defendant Osten personally attacked him and made his working conditions intolerable.  (*Id.*)  (Specifically, Gentes alleges that Defendant Osten publicly attacked him, claiming he was attempting to derail her candidacy for re-election and calling him a liar at public meeting he did not attend.  The Complaint indicates that these events took place after his resignation.  (*Id.*))

Four days after he resigned, effective July 7, 2018, the BOE held a special meeting on June 11, 2018, which both Gentes and Defendant Osten attended.  (*Id.* ¶ 76.)  In relevant part, Gentes reported that the BOE budget was under-funded due to Defendant Osten's insistence on the inclusion of an $800,000 grant that never

materialized and $600,000 of unanticipated expenses that violated the BOE's procedures and manual.  (*Id.* ¶ 77.)  During this report, Defendant Osten opposed Gentes and tried to silence him by talking over him.  (*Id.*)

On June 14, 2018, the Norwich Bulletin ran an article entitled "Officials Call for Closer Look at Sprague's School Budget."  (*Id.* ¶ 80.)  In this article, Defendant Osten was quoted stating that the BOF tasked her with obtaining quotes from audit companies.  (*Id.*)  The article also quoted Gentes:

> Gentes said he discovered the deficit to be much larger than first anticipated after noticing several expenditures that were retroactively entered into the school's finance software. He is one of two people who have access to the software. He declined to identify the second person who has access to the reports and  he maintains he did not enter the expenditures. He said he checked the school's year-to-date finance report on May 10, and the total budget ran to $6.06 million. He ran a second report on Tuesday that was back-dated to give the year-to-date expenditures to May 10 for a second time. That time, the report showed a total budget of $6.6 million – a $551,720 difference.

(*Id.* ¶ 81.)  The following day, Gentes no longer had access to the BOE accounting system and he did not return to the office.  (*Id.* ¶ 85.)

On June 19, 2018, Gentes "corresponded in writing" with Defendant Osten, informing her of his belief that she was making slanderous statements about him, requesting she desist, and citing the elements of defamation.  (*Id.* ¶ 87.)

### C. *Post-Employment*

Gentes' employment ended July 7, 2018.  (*Id.* ¶ 88.)  Before Gentes started his new position with Thompson Public Schools, Defendant Osten mailed a letter to his new employer "attempting to interfere with Gentes' employment and cause him to lose his job."  (*Id.* ¶ 89.)  The letter is not quoted in the Complaint, nor is it attached.

The Town's Board of Selectmen, BOE and BOF held a joint meeting on July 31, 2018, that was broadcast over the BOE's website and Facebook Live.  (*Id.* ¶¶ 90–91.)  In relevant part, Defendant Osten stated the following:

> The facts are that the Business Manager captured your signature and approved those expenses without you really knowing about it....
>
> I think the person who did your books here should be arrested, I firmly believe that, and I think that the Board of Ed should vote for that...you don't have two sets of books. You don't capture someone else's signature and sign things. You don't go to Board of Ed meetings and posit that you're not over budget when you're clearly over budget. That cannot happen, we have to hold somebody accountable....
>
> I think you were lied to. I flat out think you were lied to. And I think we should hold somebody accountable for that. And I'm serious about that. Because they have devastated the town for the decade....
>
> [W]e are in huge trouble right now, huge trouble. It was directly because someone lied to you all and put the town in jeopardy. And we have passed that person along to another school system. They are going to be in the same position because the person, according to Phil who is doing the books, did not know what he was doing. Did not know what he was doing. And he set us up. And it is unacceptable to me that we passed that along to another school system.

(*Id.* ¶ 92.)  Superintendent Erwin echoed Defendant Osten's sentiments, adding that "We couldn't trust the numbers from the person who was in our employ."  (*Id.* ¶ 94.)

On August 1, 2018, Gentes sent another letter to Defendant Osten requesting she stop making defamatory statements. (*Id.* ¶ 95.)  However, on August 16, 2018, Defendant Osten doubled down at a public BOF meeting broadcast on Facebook Live, blaming Gentes for the budget crisis.  (*Id.* ¶ 96.)  She criticized him for including the $800,000 grant, stating "Everybody knew that grant was not going to happen."  (*Id.*) She also accused Gentes of writing his own job description that gave him complete power without checks and balances.  (*Id.*)  Defendant Osten

pressured her Board of Selectmen members to sue Gentes in a subsequent October 2018 meeting.  (*Id.* ¶ 97.)

The Town applied for financial assistance to address the $835,000 deficit.  (*Id.* ¶ 98.)  On March 1, 2019, Defendant Osten attended a meeting with the state-appointed financial assistance subcommittee.  (*Id.* ¶ 104.)  There, she announced the Town would seek to hold Gentes accountable for "having provided false and misleading financial information to the BOE."  (*Id.*)  When asked whether Gentes had done anything illegal, she responded "No."  (*Id.* ¶ 115.)

On May 13, 2019, the Town initiated a lawsuit against Gentes for breach of contract and breach of fiduciary duty.  (*Id.* ¶ 105.)  Gentes alleges the Town did so even though it did not have a contractual relationship with Gentes; rather, he entered into his employment contract with the BOE.  (*Id.*)  Once this lawsuit was filed, Defendant Osten sent a letter to Gentes' employer informing them of the lawsuit.  (*Id.* ¶ 107.)  The Complaint indicates the "lawsuit was riddled with false allegations, in another attempt to have [him] fired."  (*Id.*)

On May 16, 2019, the Norwich Bulletin ran an article about the Town's budget cuts.  (*Id.* ¶ 108.)  The article stated, "The unbudgeted spending — which Robert Gentes, the school's business manager at the time, failed to tell school and town officials about until last June, according to First Selectman Cathy Osten — wiped out Sprague's cash reserve and has left it with unpaid debts."  (*Id.*)

The following day, the BOF held a public meeting broadcast on the internet, in which Defendant Osten blamed Gentes for the overspending, referenced the lawsuit, and implored the Superintendent and BOE Chair to confirm Gentes

"overspent taxpayer dollars."  (*Id.* ¶ 110.)  They agreed with her statements.  (*Id.*)  Defendant Osten stated they notified the FBI and hired a forensic auditor to evaluate the books.  (*Id.* ¶ 112.)

In September 2019, the Norwich Bulletin ran a third article quoting Defendant Osten, who again blamed Gentes for the overspending.  She also blamed Gentes at a Town meeting later that month, stating: "It is not the fault of the Board of Education. To be very clear, it is the fault of the Business Manager who decided that he could spend money without getting it approved. That is his responsibility." (*Id.* ¶ 114.)

Defendant Osten's campaign materials were circulated in October 2019.  Her materials referenced the lawsuit and stated it was brought against Gentes "for overspending the Board of Education budget by 13% and telling no one."  (*Id.* ¶ 118.)  Through counsel, Gentes wrote to Defendant Osten requesting a retraction of the defamatory statements.  (*Id.* ¶ 120.)  She refused.  (*Id.* ¶ 122.)  Ultimately, Defendant Osten lost her reelection bid on November 5, 2019, by a vote of 568 to 489.  (*Id.* ¶ 123.)   Gentes does not allege she made any allegedly slanderous statements thereafter.  (*See id.* ¶ 124.)

## II.    <u>Legal Standard</u>

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In considering a motion to dismiss for failure to state a claim, the Court should follow a "two-pronged approach" to evaluate the sufficiency of the complaint. *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010). "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). "At the second step, a court should determine whether the 'wellpleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (internal quotations omitted).

III.   <u>Discussion</u>

Defendants move to dismiss the four constitutional rights violations against Defendant Osten (Counts One through Four) and the municipal liability claim against the Town (Count Five).  The Court addresses each Count in numerical order.

A.   *Count One: Selective Enforcement, Equal Protection Violation Against Defendant Osten*

"The Equal Protection Clause requires that the government treat all similarly situated people alike." *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). Gentes seeks to vindicate his equal protection rights under the doctrine known as

"selective enforcement."[1]  Under this theory, "a plaintiff must allege (1) that he or she was treated differently from other similarly situated individuals, and (2) that the 'treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'"  *Bush v. City of Utica, N.Y.*, 558 F. App'x 131, 134 (2d Cir. 2014) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609–10 (2d Cir. 1980)).

### 1.    Comparators

Defendants argue Count One should be dismissed because Gentes has not identified any individuals who were similarly situated but treated differently. Gentes disagrees and points to paragraph 132 of Count One in the Complaint, which reads, in relevant part, as follows:

> Defendant Osten selectively used the powers of the First Selectman's Office of the Town of Sprague to punish Plaintiff for the budgeting and spending issues when Defendant Osten herself, the members of the BOE, Superintendent Erwin and Bookkeeper Diane LaRowe were responsible for the state of the BOE finances in FY2018.

(Dkt. 1 ¶ 132, Count One.)[2]  Gentes argues that "the issue of whether [these] individuals are similarly situated is a question of fact that should not be resolved against Plaintiff on a motion to dismiss."  (*See* Dkt. 58 (Pl.'s Opp'n) at 33.)

---

[1] The Court wishes to clarify possible confusion about the type of claim Plaintiff raises. Defendants cite cases addressing two equal protection theories: "selective enforcement" and "class of one."  Because Plaintiff describes Count One as a "selective enforcement" claim, addresses only the "selective enforcement" elements in his brief, and never mentions a "class of one" legal theory, this Court concludes Plaintiff intended to raise only the "selective enforcement" theory.

[2] The numbered paragraphs for each Count in the Complaint overlap.  Accordingly, the Court references the specific Count where there are multiple paragraphs with the same number.

In a selective enforcement claim, the similarly situated inquiry is the same as the standard used in Title VII, 42 U.S.C. § 1981, and other Equal Protection claims. *Hu v. City of New York*, 927 F.3d 81, 93 (2d Cir. 2019) (adopting *Graham v. Long Island Rail Road*, 230 F.3d 34 (2d Cir. 2000) in a selective enforcement case). That is, Gentes must allege facts that show he has a "reasonably close resemblance" to the comparators, i.e., that he "was similarly situated in all material respects to the individuals with whom [he] seeks to compare [him]self." *Graham*, 230 F.3d at 39; *Hu*, 627 F.3d at 96 (same). A plaintiff can prove he is similarly situated to another employee if they are "subject to the same workplace standards" and they both engaged in conduct that was "of comparable seriousness." *Graham*, 230 F.3d at 40. Context, surrounding circumstances, and the acts themselves all impact whether the conduct is of "comparable seriousness." *Radwan v. Manuel*, 55 F.4th 101, 132 (2d Cir. 2022).

Gentes is correct that the "similarly situated" inquiry is fact-intensive and generally inappropriate on a motion to dismiss. *See Hu*, 927 F.3d at 97. But he still must satisfy the Rule 8 pleading standard. *See* Fed. R. Civ. P. 8(a)(2) (requiring "a short and plain statement of the claim showing that the pleader is entitled to relief"). While the *Twombly/Iqbal* pleading standard does not require "detailed factual allegations," the allegations must rise above the "speculative level." *Twombly*, 550 U.S. at 555.

Here, all that Gentes alleges is that his supposed comparators "were responsible for the state of the BOE finances in FY2018." This allegation overlooks the fact that responsibilities vary widely when it comes to managing an agency's

finances.  It requires the Court to speculate about the finance-related job duties, the acts they performed, and the workplace standards that might possibly make these individuals similarly situated in all "material respects."   Indeed, the Complaint is replete with allegations that show these individuals' roles and acts were materially **different** from Gentes'.   LaRowe performed human resources, information technology, bookkeeping, and accounts payable duties—duties the Complaint makes clear Gentes did not perform.  (*See* Dkt. 1 ¶¶ 63, 65, 70, 71.) Superintendent Erwin's responsibilities encompassed "operations of Sprague public schools, including supervision of the Director of Special Education."  (*Id.* ¶ 8.)  Gentes reported to Superintendent Erwin and required the Superintendent's authority to perform certain functions.  (*Id.* ¶¶ 12, 14, 35, 68.)   As for the BOE members, the allegations related to them focus solely on their authority to approve a budget and write checks; tasks which Gentes was not authorized to perform. (*See id.* ¶¶ 42–43, 65.)  Lastly, Defendant Osten served as a local politician who is alleged to have violated Gentes' equal protection rights.  (*See id.* ¶ 3.)  It defies credulity that she—a publicly elected official who, under state law, served the Town and its constituents as the chief executive officer—could be similarly situated to any other employee or official of the Town and/or the BOE.  Based on the facts in the Complaint, the proposed comparators are not similarly situated as a matter of law, because they do not share a "reasonably close resemblance," were not subject to the same workplace standards, and did not commit acts of "comparable seriousness."   Accordingly, he fails to adequately plead a selective enforcement claim.

To the extent Gentes believes that Rule 8's pleading standard does not require him to plead comparators, his reliance on *DeMuria v. Hawkes*, 328 F.3d 704 (2d Cir. 2003) is misplaced.  While it is true that *DeMuria* held a plaintiff could satisfy Rule 8 "without specification of others similarly situated," it predated the Supreme Court's decision in *Ashcroft v. Iqbal*, and used the "now-obsolete" general pleading standard.  *Ruston v. Town Bd. For Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010).  Post-*Iqbal*, the Second Circuit explicitly rejected *DeMuria*'s holding and rationale.  *See id.*  Accordingly, Gentes' reliance on this case is unpersuasive.

### 2.    Intent

Because Gentes has failed to show he was treated differently than a similarly situated comparator, the Court does not evaluate the second element, Defendant Osten's intent.  Accordingly, Count One is dismissed.

### B.    *Count Two: First Amendment Retaliation, Against Defendant Osten*

"'[A]s a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions' for engaging in protected speech."  *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)); *see also Houston Cmty. Coll. Sys. v. Wilson*, 142 S. Ct. 1253, 1260 (2022) ("The First Amendment prohibits laws 'abridging the freedom of speech.'").  While the First Amendment protects an individual's freedom of speech, "it is well understood that the right of free speech is not absolute at all times and under all circumstances."  *Chaplinsky v. State of New Hampshire*, 315 U.S. 568, 571 (1942); *c.f. Piscotanno v. Town of Somers*, 396 F. Supp. 2d 187, 200 (D. Conn. 2005) ("Speech on public issues and political matters lies at the heart of protected speech.").

The elements of a First Amendment retaliation claim are dependent upon the "factual context" of the case. *Williams v. Town of Greenburgh*, 535 F.3d 71, 76 (2d Cir. 2008).  There are two typical scenarios that are relevant here: speech made by a public employee and speech made by a private citizen.  A public employee who alleges First Amendment retaliation must prove the following: "(1) the speech at issue was made as a citizen on matters of public concern rather than as an employee on matters of personal interest; (2) he or she suffered an adverse employment action; and (3) the speech was at least a substantial or motivating factor in the adverse employment action."  *Johnson v. Ganim*, 342 F.3d 105, 112 (2d Cir. 2003) (internal quotation marks and citations omitted); *Agosto v. New York City Dep't of Educ.*, 982 F.3d 86, 94 (2d Cir. 2020) (enumerating substantially similar elements).  A private citizen, on the other hand, must show: "(1) he has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of his First Amendment right," *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001), or caused some other form of "concrete harm," *Zherka v. Amicone*, 634 F.3d 642, 646 (2d Cir. 2011).  Unlike a public employee, the speech of a private citizen "need not have been on a matter of public concern for it to fall within the protection of the First Amendment[.]" *Williams*, 535 F.3d at 77; *see also Howard v. City of New York*, 602 F. App'x 545, 548 (2d Cir. 2015) (stating public employees are "held to a higher standard" because speech must touch on "matter of public concern").

As pleaded in the Complaint, Gentes' First Amendment retaliation claim is based on the "public employee" theory.  For context, the paragraphs under Count Two describe Gentes as a "public citizen" and repeatedly refer to his speech as touching on a "matter of public concern."  (*See* Dkt. 1 ¶¶ 132–135, Count Two.)

### 1.    Gentes' Speech

A public employee enjoys free speech protections only if he speaks "as a citizen on a matter of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). A court must first evaluate whether the speech is "of public concern;" if it is, then the question becomes whether the public employee spoke as a "citizen."  *See Jackler, v. Byrne*, 658 F.3d 225, 235 (2d Cir. 2011) (citing *Garcetti*, 547 U.S. at 420–22, 424).

With respect to the first element, a government employee's speech is "of public concern" when it relates to "any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146 (1983).  In other words, "a topic is a matter of public concern for First Amendment purposes if it is 'of general interest,' or 'of legitimate news interest,' or 'of value and concern to the public at the time' of the speech."  *Jackler*, 658 F.3d at 236 (quoting *City of San Diego Cal. v. Roe*, 543 U.S. 77, 83–84 (2004)).  Whether speech involves a matter of public concern is a question of law for the court to decide after examining the "content, form, and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 146–47; *Jackler*, 658 F.3d at 235 (applying this standard at the pleadings stage).

As for the second element, "when public employees make statements pursuant to their official duties, they are not speaking as citizens for First Amendment purposes[.]"   *Garcetti*, 547 U.S. at 421.   "Official duties" are synonymous with those performed in the employee's "daily professional activities," *id.* at 422, i.e., if it is "part of what the employee is paid to do," *Janus v. Am. Fed. of State, Cnty. & Mun. Emp., Council 31*, 138 S. Ct. 2448, 2471 (2018).   "As a rule of thumb, activities required of the employee as part of his employment duties are not performed 'as a citizen' if they are not 'the kind of activity engaged in by citizens who do not work for the government.'" *Jackler*, 658 F.3d. at 237 (quoting *Garcetti*, 547 U.S. at 423).   The reasoning behind this distinction is that a public employee's speech made in the course of "official duties" is "for constitutional purposes at least—the government's own speech."   *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2423 (2022).

It may be true that the content, form and context of Gentes' speech concerned a "matter of public concern."   Indeed, it would be hard to argue that the BOE's budget problems are not "of legitimate news interest" or "of value and concern to the public at the time of the speech" when the Norwich Bulletin published an article about it and the Town's constituents were required to vote on budget issues.   (*See* Dkt. 1 ¶ 80–81.)

When it comes to the second element, however, Gentes has not pleaded enough facts to show his speech extended beyond his "official duties."   He attended the April 2018 BOF public meeting in his capacity as a BOE representative and made a presentation on the BOE's finances based on information he learned

in his official duties.  Even when he subsequently joined the audience, his speech concerned "proper allocation of grants" and the potential for BOE employees to be held liable under state law, (Dkt. 1 ¶¶ 132–34, Count Two)—information, at least in part, he knew and about which he was uniquely qualified to comment because of his position as the BOE's Business/Facilities Manager.  Indeed, Gentes' pushback about BOE members' individual liability is not within the knowledge of an average citizen.  Coming from him, particularly after he made a formal presentation in his official capacity earlier at the meeting, it is likely his comments seemed authoritative and bore an air of officialdom, based on the facts alleged in the Complaint.    The same is true with respect to his quote published by the Norwich Bulletin on June 14, 2018.  (*See id.* ¶ 135.)  In describing his discovery of the budget deficit and his colleague's purported entry of back-dated expenditures, he disclosed information he learned in his official capacity as Business/Facilities Manager.  (*See id.*)  Accordingly, as pleaded, Gentes' speech is not protected because he did not speak outside the scope of his authoritative official duties.  *See Janus* 138 S. Ct. at 2471 (explaining "employee speech is largely unprotected if it is part of what the employee is paid to do"); *Jackler*, 658 F.3d at 237 (stating that "activities required of the employee as part of his employment duties are not performed as a citizen if they are not the kind of activity engaged in by citizens who do not work for the government") (internal quotation marks omitted).

Gentes cites *Matthews v. City of New York*, 779 F.3d 167 (2d Cir. 2015) for the proposition that his speech at a public meeting and to the press constituted "citizen speech," because these channels generally were available to citizens.  (*See*

Dkt. 58 at 16.)   The *Matthews* plaintiff was a police officer who expressed his concerns about his supervisors' use of a quota system to the precinct's commanding officer.   *Matthews*, 779 F.3d at 169.   The police department held monthly public meetings that gave civilians the opportunity to lodge concerns and complaints.   *Id.* at 172.   The Second Circuit stated that the "existence of a comparable civilian analogue"—i.e., speech "made through channels available to citizens generally"—supports the conclusion that the plaintiff spoke "as a citizen." *Id.* at 175–76.   There is an important distinction between Gentes and the *Matthews* plaintiff, however.   The *Matthews* plaintiff's speech extended beyond his official duties.   *Id.* at 174.   Unlike the *Matthews* plaintiff, Gentes' official duties as Business/Facilities Manager included speaking at the public meeting.   With respect to the Norwich Bulletin, Gentes gave substantive reasons why the BOE experienced an overspending problem, which is an inquiry he was uniquely qualified to answer in his capacity as the BOE's Business/Facilities Manager.

## 2.   Adverse Action

Even if Gentes could show his speech was protected under the "public employee" theory, he still would not satisfy his obligation to plead facts tending to show his employer took an adverse action against him.   Gentes maintains that the BOE, not the Town, was his employer.   (Dkt. 1 ¶ 2.)   Connecticut jurisprudence would suggest otherwise.   As the Connecticut Supreme Court explained in *Rettig v. Town of Woodbridge*, 304 Conn. 462, 482 (2012):   "[M]unicipal boards and agencies are extensions of the towns they serve, created for the purpose of performing those functions that towns are statutorily required or permitted to

perform.   They are, in effect, alter egos of the towns."   Indeed, the Town's governance is structured through a set of ordinances dating back to its incorporation in 1861.   *See generally* Town of Sprague, Conn., Ordinances, https://ctsprague.org/ordinances.htm (last visited Aug. 11, 2023).   None of them reference the BOE at all, let alone classify it as a separate entity from the Town. This distinction is without a difference, however, because it is undisputed that Gentes resigned.  (*See* Dkt. 1 ¶¶ 83, 88; Dkt. 53 (Ans.) ¶¶ 83, 88.)

To the extent he contends Defendant Osten's other actions forced him to resign, this is not supported by the chronology of events.  Namely, Gentes spoke at the public meeting on April 19, 2018, noticed his resignation on June 7 (effective July 7), issued a public statement with the Norwich Bulletin on June 14 and ended his employment on July 7.   The examples he cites as supporting an "adverse employment action" all took place after his employment ended.  (*See* Dkt. 58 at 22.)

Notwithstanding the allegations in the pleading, Gentes argues in his opposition that his First Amendment retaliation claim is <u>not</u> based on the "public employee" theory but is rather based on his speech as a "private citizen." Specifically, Gentes states he "neither alleges a First Amendment retaliation claim against his employer, nor alleges that Defendants subjected him to retaliation when they were acting in the capacity of Plaintiff's employer."  (*See id.* at 12–13.)  Gentes argues he is entitled to the more robust First Amendment rights afforded to private citizens, because he has not brought a First Amendment claim against his employer.

"[I]t is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss." *Budhani v. Monster Energy Co.*, No. 20-cv-1409 (LJL), 2021 WL 5761902, at *3 (S.D.N.Y. Dec. 3, 2021) (quoting *O'Brien v. Nat'l Prop. Analysts Partners*, 719 F. Supp. 222, 229 (S.D.N.Y. 1989)).   By virtue of the expressed language in Gentes' Complaint, Defendants have not been given the opportunity to brief whether he fails to establish the requisite "private citizen" elements.  (Defendants maintain that the *Garcetti* doctrine applies given the nature of his speech.)   The current complaint does not satisfy the Rule 8 pleading standard, because a First Amendment retaliation claim brought by a private citizen requires satisfying entirely different elements.  *See Dorsett v. Cnty. of Nassau*, 732 F.3d 157, 160 (2013).

The Court will give Gentes the opportunity to replead his First Amendment claim as a private citizen.  This case presents an a-typical situation, because Gentes spoke while acting as a "public employee" but alleges that an elected official—who he contends is not his employer—retaliated against him.  While the Court is dubious that repleading will be successful for the reasons stated above, the Court finds that giving leave to amend satisfies the interests of justice.  *See* Fed. R. Civ. P. 15(a)(2).

        C.     *Count Three: Liberty Interest, Procedural Due Process Violation Against Defendant Osten*

Gentes alleges that Defendant Osten violated his liberty interest in his reputation by making "stigmatizing statements that were harmful to Plaintiff's reputation" and then using "the power of her office as the highest ranking authority and policy-maker of the Town of Sprague to burden Plaintiff by state action in

making him a defendant and forcing him to incur the expense and anxiety of being named publicly in a vexatious lawsuit….."   (Dkt. 1 ¶ 133, Count Three.)   He also alleges that Defendant Osten failed to provide him a "name-clearing hearing" before she made the "false and stigmatizing statements."   (*Id.* ¶ 135, Count Three.)

"To prevail on a "stigma plus" claim, a plaintiff must show (1) the utterance of a statement "sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she claims is false," and (2) a material state-imposed burden or state-imposed alteration of the plaintiff's status or rights." *Sadallah v. City of Utica*, 383 F.3d 34, 38 (2d Cir. 2004).   There is no requirement on courts reviewing stigma-plus claims to analyze the first element—the "stigma" requirement—before the second element—the "plus" requirement.   *See id.* (finding the plaintiff failed to meet the "plus" requirement without considering the "stigma" requirement).

Defendants only challenge the "plus" aspect of this claim.   "The relevant state-imposed burden must be separate from the stigmatizing statement and may take the form of a 'deprivation of a plaintiff's property' or the 'termination of a plaintiff's government employment.'" *Mudge v. Zugalla*, 939 F.3d 72, 80 (2d Cir. 2019) (quoting *Sadallah*, 383 F.3d at 38).   Even if the defendant's statements satisfy the "stigma" element, "such defamation is not, absent more, a deprivation of a liberty or property interest protected by due process."   *Sadallah*, 383 F.3d at 38 (internal citations and quotation marks omitted) (emphasis in original).   In other words, "deleterious effects [flowing] directly from a sullied reputation,' standing

alone, do not constitute a 'plus' under the 'stigma plus' doctrine." *Id.* (citing *Valmonte v. Bane*, 18 F.3d 992, 1001 (2d Cir. 1994)).

The Court addresses the purportedly "vexatious" lawsuit first.  As previously mentioned, the lawsuit has survived summary judgment and will proceed to trial. To be sure, Gentes has incurred expenses as a result of defending himself over nearly four years of litigation.  Gentes cites *Velez v. Levy*, 401 F.3d 75 (2d Cir. 2005) for the proposition that "[b]y making Plaintiff a defendant in the State Court Action, Osten and the Town certainly subjected Plaintiff to a state-imposed burden."  (Dkt. 58 at 39.)  However, *Velez* is substantively different, because the plaintiff asserted "that the stigma she suffered from public accusations of criminal behavior, combined with the tangible loss of her position as a community board member, amounted to a constitutionally cognizable deprivation of liberty without sufficient process."  *Velez*, 401 F.3d at 87 (emphasis added).  In other words, the deprivation was her termination, not the filing of a lawsuit, which the Town has a statutory right to initiate.  Given that the Town has a statutory right to file a lawsuit, the state court action has enough merit to survive summary judgment, and Gentes has failed to provide legal authority that establishes an individual is deprived of his liberty interest when he is named as a defendant, the Court concludes the state court lawsuit itself does not satisfy the second element of the stigma-plus claim.

Gentes also alleges Defendant Osten's public comment about the lawsuit has impacted his ability to obtain employment with other school districts.  (*See* Dkt. 58 at 39.)  As the Second Circuit explained in *Valmonte*, 18 F.3d at 1001, examples of "deleterious effects which flow directly from a sullied reputation"—

which standing alone are insufficient—"would normally include the impact that defamation might have on job prospects or … romantic aspirations, friendships, self-esteem, or any other typical consequence of a bad reputation."  The *Valmonte* plaintiff brought a "stigma plus" claim against two social services commissioners for placing her name on a public child abuse and maltreatment register.  *Id.* at 994. The Second Circuit distinguished the plaintiff's circumstance from unactionable "deleterious effects" like diminished job prospects, reasoning potential employers "*must* consult the list before hiring Valmonte, and if they choose to hire her must state the reasons in writing to the state."  *Id.* at 1002 (emphasis in original).  The Second Circuit concluded this constituted a "specific deprivation of her opportunity to seek employment caused by a statutory impediment established by the state."  *Id.*  Gentes' allegations clearly do not rise to this level.  He does not allege that he was blacklisted in any way or that he cannot be hired unless the prospective employer writes to the state.  In fact, Gentes resigned and took another position. While Gentes alleges superintendents from other districts described Gentes as a "nut" to his current supervisor, (Dkt. 1 ¶ 129), he does not allege who these superintendents are, whether he applied to a job in those districts, whether he was denied a job, or whether his reputation as a "nut" came from the disputes with Defendants.   Defendant Osten's "vexatious" and "malicious" comments therefore do not satisfy the second element.

The Court now addresses Gentes' alleged deprivation of a "name-clearing hearing prior to making false and stigmatizing statements."  "Like any procedural due process claim, a stigma-plus claim enforces a limited but important right: the

right to be heard 'at a meaningful time and in a meaningful manner.'" *Segal v. City of New York*, 459 F.3d 207, 213 (2d Cir. 2006)  (quoting *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970)).  If a plaintiff is "deprived of liberty without due process of law," the court may "consider what process is due."  *Donato v. Plainview-Old Bethpage Ctr. Sch. Dist.*, 96 F.3d 623, 633 (2d Cir. 1996).  "Since due process is a flexible notion, the procedural protection accorded a constitutional interest is determined by reference to the particular circumstances of a given case."  *Id.*

From this Court's assessment of cases involving name-clearing hearings—which typically address the adequate process of a pre- or post-termination hearing—Gentes' allegation is a-typical insofar as he believes he was entitled to a name-clearing hearing prior to Defendant Osten making a public statement against him.  The parties have not alerted the Court to an analogous situation; in fact, Gentes did not cite any case law at all.

Nonetheless, the Court finds *Huntley v. Community School Board*, 543 F.2d 979 (2d Cir. 1976), instructive.  As a brief background, *Huntley* involved a principal who was terminated for incompetence without receiving the opportunity to respond at all.  Prior to his termination, the superintendent sent the school board a letter with formal charges against the principal, recommending his termination.  *Id.* at 982.  The principal never received the charges, nor was he given the opportunity to respond to them when they were read at a public meeting.  The school board terminated him and the charges were placed in his record.  *See id.* at 985.  The Second Circuit observed that the publicly read charges "go to the very heart of [the plaintiff's] professional competence," became part of his record, and

were "made a matter of public knowledge." *Id.* The Second Circuit held the plaintiff "was entitled to a fair hearing prior to the Board's public announcement of charges which might impair his chances of future employment as a school supervisor and which might damage his professional reputation." *Id.* at 986. The basis for this holding: "[T]he protections of the Fourteenth Amendment are available whenever the state, <u>in terminating an individual's employment</u>, makes charges against him that will seriously impair his ability to take advantage of other employment opportunities." *Id.* at 985 (emphasis added).

To be sure, there is some overlap between the public criticism about Gentes' and the *Huntley* principal's competence. The key distinction is that Gentes was not terminated—he resigned, and the Town accepted his resignation. The *Huntley* principal could not obtain a supervisory role as a result of the public criticism, the inclusion of the charges in his record, and his termination. In contrast, Gentes resigned and took another employment opportunity. He does not allege he was terminated or suffered any concrete adverse consequence. The Complaint does not allege anything was placed in his permanent employee record nor that he applied for and was denied employment as a consequence of the accusations. (*See* Dkt. 1 ¶ 128 (failing to allege Plaintiff applied for position with Norwich Free Academy but was denied).) Therefore, there is no occasion for the Court to "consider what process is due," i.e., whether he was not afforded an adequate opportunity to clear his name. *See Donato*, 96 F.3d at 633. Accordingly, Gentes fails to establish the second element of his stigma-plus claim.

**D.** *Count Four: Harassment, Substantive Due Process Violation Against Defendant Osten*

Defendants argue Count Four must be dismissed because it rests on the same factual allegations as Gentes' other constitutional claims. Gentes argues that he may plead a substantive due process claim in the alternative to his other constitutional violation claims, and that he is not required to plead a constitutional violation as a predicate to his substantive due process claim. (Dkt. 58 at 41–43.)

Government conduct violates a plaintiff's Fourteenth Amendment right to substantive due process only where it is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n. 8 (1998). On one side of the scale, "malicious and sadistic abuses of power by government officials, intended to oppress or to cause injury and designed for no legitimate government purpose, unquestionably shocks the conscience." *Velez*, 401 F.3d at 94 (internal quotation marks omitted). On the other side of the scale, "incorrect or ill-advised" government action clearly falls short of an actionable substantive due process claim. *Lowrance v. Achtyl*, 20 F.3d 529, 537 (2d Cir. 1994) ("Substantive due process protects individuals against government action that is arbitrary, conscience-shocking, or oppressive in a constitutional sense, but not against government action that is incorrect or ill-advised.") (internal citations omitted). Constitutional violations lie somewhere in the middle of the scale but do not, in and of themselves, "shock the conscience" for the purposes of substantive due process. *Velez*, 401 F.3d at 94. Accordingly, where factual allegations shock the conscience only insofar as they constitute specific constitutional violations, plaintiffs may not seek redress under the "broad

30

notion of substantive due process." *Id*. (dismissing substantive due process claims where allegations amounted to First Amendment and Equal Protection violations).

As pleaded, the allegations related to Gentes' substantive due process claim are subsumed within his other constitutional rights claims.  First, Gentes' abridged right is his "liberty interest in his reputation," which forms the basis of his procedural due process claim (Count Three).  (*See* Dkt. 1 ¶ 135, Count Three.) Second, the allegations concerning Defendant Osten's conduct that allegedly violated Gentes' substantive due process rights (paragraph 133 of Count Four) are identical to the allegations of her conduct that allegedly violated Gentes' Fourteenth Amendment equal protection rights (paragraph 133 of Count One) and First Amendment rights (paragraph 137 of Count Two).  These identical allegations are proof positive that his substantive due process claim is subsumed within the others.

The Second Circuit in *Velez* affirmed the lower court's dismissal of the substantive due process claim when the "allegedly shocking" conduct from defendants also constituted "their intent to violate plaintiff's fundamental First Amendment rights, or their motive to deprive her of liberty without procedural due process."  *Velez*, 401 F.3d at 94.  The Second Circuit reasoned,

> Because we believe that, as a matter of law, defendants' purported actions would not—but for the allegations of First Amendment violations, or (now abandoned) Equal Protection Clause violations—be sufficiently shocking to state substantive due process claims, we conclude that plaintiff's substantive due process claim is either subsumed in her more particularized allegations, or must fail. Accordingly, we affirm the district court's dismissal of Velez's substantive due process claim against all the defendants.

*Id*.  In employing the same reasoning, but for the allegations that are identical to his First Amendment and Equal Protection violation allegations, Gentes would have no substantive due process claim at all.  Count Four therefore fails.

Gentes seems to believe that dismissal of his other constitutional rights claims forms a valid reason for permitting his substantive due process claim to go forward.  The Court disagrees.  "[W]here another provision of the Constitution provides an explicit textual source of constitutional protection, a court must assess a plaintiff's claims under that explicit provision and not the more generalized notion of substantive due process."  *Conn v. Gabbert*, 526 U.S. 286, 293 (1999) (internal quotation marks removed).  In other words, if the factual allegations are more appropriately brought under a specific provision of the Constitution, general substantive due process protection is inappropriate.  See *Hu*, 927 F.3d at 103 (affirming dismissal of the plaintiffs' substantive due process claim on the grounds that it was subsumed by their equal protection claim, reasoning, both claims "rest on the same factual allegations").  Here, Defendant Osten publicly criticized Gentes as a result of the BOE's egregious overspending, his role in the BOE's finances, and his public comments about the mismanagement.  The fact that Gentes has not alleged a viable First Amendment retaliation or Equal Protection claim does not mean that those constitutional provisions were not applicable or available to him.  It simply means he fails to state a claim as to those counts.  Put another way, if a plaintiff cannot even plead facts establishing the underlying constitutional violation, then surely those same facts do not establish conduct that "shocks the conscience."

Gentes also contends that he should be able to plead alternative claims involving presumably identical facts.  In support, he relies on *Royal Crown Day Care LLC v. Dep't of Health and Mental Hygiene*, 746 F.3d 538, 543 (2d Cir. 2014). This case is unpersuasive.  The *Royal Crown* plaintiffs owned a daycare and sued the City of New York's Department of Health and Mental Hygiene and government employees for shutting down the daycare in retaliation for a complaint letter they sent to a state senator.  Their First Amendment retaliation claim was based on retaliation for sending the letter, whereas their substantive due process claim was based on their property interest in the daycare operation permit.  In other words, the substantive due process claim concerned an abridged property right and the retaliation claim concerned an abridged free speech right.  Here, the substantive due process claim is based on the same factual allegations and liberty interest as his other claims.  *Royal Crown* is therefore distinguishable.

Perhaps appreciating the deficiency of his Complaint, Gentes requests leave to amend this count "[i]f the Court has concerns about the way that this claim is pleaded in the Complaint."  (Dkt. 58 at 44.)  The Court grants leave to replead, but Gentes must first evaluate whether he can allege factual allegations that satisfy the elements of a substantive due process claim distinct from those of his First Amendment retaliation claim.  In doing so, Gentes shall only consider Defendant Osten's conduct <u>as a state actor</u>, as opposed to her private conduct.  *See Polk Cnty. v. Dodson*, 454 U.S. 312, 317 (1981) ("It has long been held that a person acts under color of state law only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority

of state law.'"); *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (stating a public official's actions are not "under color of law" when they are "merely private conduct, no matter how discriminatory or wrongful"); *Munoz-Feliciano v. Monroe-Woodbury Cent. Sch. Dist.*, 2015 WL 1379702, at *4 (S.D.N.Y. Mar. 25, 2012) (dismissing § 1983 claims for failure to allege state action, because the "allegations arising out of the 'smear campaign'" were not related to a public official's use of state law authority).

   E. *Count Five: Monell Liability Against Defendant Town of Sprague*

  "[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). To hold a municipality liable under 42 U.S.C. § 1983, a plaintiff must prove that the asserted violation of a federally protected right was caused by a municipal policy, a municipal custom or practice, or the decision of a municipal policymaker with final policymaking authority. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988). A plaintiff must further demonstrate that, "through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okla. v. Brown*, 520 U.S. 397, 404 (1997) (emphasis in original). "That is, a plaintiff must show that the municipal action was taken with the requisite culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.*

  At present, Gentes has not pleaded any constitutional rights claims that would confer *Monell* liability. When a *Monell* claim is based on the decision of a municipal policymaker with final policymaking authority, a single action by such

a decisionmaker is sufficient to confer municipal liability under § 1983.  *See Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir. 2004).  As First Selectman, Defendant Osten acted as the chief executive officer and presumably lead policymaker of the Town.  The Court therefore dismisses Count Five without prejudice to Gentes repleading it along with his First Amendment retaliation and substantive due process claims.

## IV.    Conclusion

For the above reasons, Counts One and Three are dismissed with prejudice. Counts Two, Four and Five are dismissed without prejudice to Plaintiff filing an amended complaint on or before September 12, 2023, that satisfies the Rule 8 pleading standard and this Court's decision.  Should Plaintiff file an amended complaint, he shall separately number each paragraph and ensure the numbers do not overlap.


IT IS SO ORDERED.

_____
Hon. Vanessa L. Bryant
United States District Judge


Dated at Hartford, Connecticut: August 22, 2023